Thank you, Judge Wardlaw, and may it please the Court, my name is Mark Caldwell. I'm representing Ms. Weiner's family this morning in this social security disability case. I will keep track of my own time, but with the court's permission, I'm going to try to reserve five minutes for rebuttal. I was confused on whether she was married. When I read the medicals and everything up to the death certificate, I thought she lived alone, and then I read the death certificate and she said she had a husband. I think she got married in the meantime, but she was definitely married at the time of her death. She was. No doubt about it. Have you filed a motion to substitute parties? Yes, I have. It was very naive of me. I frankly knew that they had substituted the husband at the administrative level and foolishly thought to myself, well, that's a done deal. But obviously, the clerk said to me. Was it done at the administrative level? Oh, yes, done. And I attached it to my motion to substitute him as a party here. But obviously, let's be honest, I should have done it here and I should have done it earlier. But I've done it. What happens to the – she had a child. The child is not – is not entitled to any benefits? Not under the statute. It goes in a certain preference. It's a husband living with her first, then children, and then I think her parents and on down to various family members. But the husband is the appropriate substituted party and has been for some time substituted at the administrative level. With that preliminary out of the way. It looked from medicals like mostly – most of the serious illness is really her symptom reports to her medical providers rather than medical providers' diagnosis based on evaluation of symptom reports or tests. Why was there no substantial evidence on the record to support what the ALJ decided? First of all, I'm going to respectfully disagree with you on especially the orthopedic impairments. The orthopedic impairments were well documented, showing severe degeneration of the lumbar spine, both by X-rays and by MRIs. True. And even possible impingement upon the nerve, which causes great pain. True. But those are common symptoms not commonly resulting in total disability. What they cause is painful backaches. Well, to some extent that may be true. Everybody feels pain differently, but certainly in this case she satisfied the test, and the ALJ said she satisfied the test of having a severe medically determinable impairment. That's one of the impairments the ALJ herself listed. So then the question becomes – No question about that. Zero question. She has a really bad back. Zero question. The ALJ herself put it in her decision. You know, what ultimately led to her death may have actually been something else. I don't think you'd die from a bad back. The orthopedic stuff would not have led to her death. Of course not. Of course not. But she had atrial fibrillation and those kinds of things, and atrial fibrillation can certainly be fatal. Well, that's really beside the point. I can't remember. Was it ventricular or supraventricular? Atrial fibrillation, I don't remember the details. But certainly we know that that's something that can be fatal. But here's the problem in this case. She stated that she had to lie down most of a typical eight-hour day. The commissioner mischaracterizes the record and says the entire day. She didn't say that. She said most of the day. And the vocational expert did not give testimony on that, because it's facially obvious that a person who has to lay down most of the day can't sustain work activities. But the vocational expert did go back and say that the treating pain specialist, nurse practitioner Longchamps, who gave an assessment, and the assessment of the agency's own examining psychologist, Dr. General, both had limitations that would preclude the ability to sustain work. In the former case the ALJ doesn't discuss either one of those reports. I'm going to agree with you and disagree with you. The ALJ doesn't discuss Longchamps at all, at all. The ALJ recognizes General's report, meaning his name is in the ALJ decision. But the ALJ does not recognize that Dr. General said there would be limits in concentration, memory, things along those lines. And those are the limits that the vocational expert said would preclude sustained work. He didn't give any weight to Dr. General. I don't know if he's not. He was a psychiatrist. He's a psychologist. Wayne General PhD. So what weight did the ALJ give to his report, if any? None. He didn't mention it. Did he explain why he wasn't given any weight? No. That's why we're here. And I would have a rule of thumb. Well, he could discredit it, couldn't he? It's possible to discredit it, but you don't, by ignoring the critical findings in both the Longchamps assessment and in Dr. General's assessment, that's the same as rejecting it. That's what this Court said in Garrison. Under the Social Security regulations, is Longchamps considered an acceptable medical source? No. Okay. So why is the ALJ required to consider her report? Again, I would go to the Garrison case, where this Court said the ALJ erred by rejecting a treating nurse practitioner's report. The word that is so very, very unfortunate is the word acceptable. It implies that if you're otherwise, you're unacceptable, which isn't true. That's the language in the statute, right? Language in the statute. But the meaning of an acceptable medical source is that an MD, a DO, a PhD, et cetera, can establish the diagnosis. Whereas the other medical source, the way it's termed, is still under Social Security ruling 063P, entitled to give an assessment of the severity of the limitations. Okay. So acceptable source doesn't mean the other source is an unacceptable source. It just simply means that they're like a witness. They cannot, yes. And I'm, frankly, in my brief, I've been somewhat critical of the way this Court's handled that. I think this Court in Molina, going back to the Clark and Taylor decisions, incorrectly is treating nurse practitioner opinion as if it was lay opinion, because it's citing cases that talk about lay opinion. And 063P, quite frankly, makes it very clear that the Commissioner herself does not view nurse practitioners' assessments as lay opinion. As a matter of fact, quite the opposite. 063P, which I quote in a couple paragraphs because I think it's so important, says that this is very, very important evidence. So was this harmless? I think the Commissioner makes the argument this was just they acknowledged that there was no discussion of this. They do. But they just essentially say it was harmless, because if you would go through and look at the other evidence in the record, obviously the ALJ would have not placed any significant weight on these two reports. And that's speculative. But number two, it's based on a very skewed reading of the record. First of all, the Commissioner doesn't even mention the vocational expert testimony that those limitations would preclude work. If you read the Commissioner's brief, you wouldn't even know that happened. So the ALJ asks hearing counsel, will you stipulate to the ALJ's, excuse me, to the vocational experts' professional qualifications? The hearing counsel says, yes, Your Honor, I'll accede to your request that I stipulate to those professional qualifications. Having done so, then the Commissioner completely ignores what the Commissioner's own witness said were disabling limitations. I don't think the Commissioner should be countenanced to do that. Rule 28J letter that I submitted has a very helpful case in this regard that was decided by this Court just within the last month or two, Marsh. And in Marsh, the treating physician made a statement that's much, much less definitive than the evidence we have here. And the statement was something like, it appears she's disabled, it's not likely she'd be able to sustain work. And this Court held in a published decision that the ALJ's failure to even mention that was reversible error. It was so much more so here when the evidence that the ALJ didn't even acknowledge led to testimony from the agency's own vocational expert. This thing that you're backing up, but I'm bothered. You're concerned that the agency didn't acknowledge Nurse Practitioner Longchamp's opinion, but when I look at what Nurse Practitioner Longchamp's did, she didn't give an opinion. All I have here is a checklist, the sort of thing that a nurse practitioner does before the doctor sees a patient, where the nurse practitioner asks what medicines are you taking, what symptoms do you have, and she goes through this list of medicines and then she has a checklist here for pain and how bad it is. Are we both looking at ER 244, Your Honor? I was looking at 241, 242, 243, 244, and 245. Okay, well, the reason I ask that question is 244 is where she's not filling out a form for the doctor, she is giving an assessment of the degree of limitation that could be expected to result from the pain. On the checklist, I see. Yes, and that was the basis for the vocational expert's testimony. This is the nurse practitioner's evaluation based on what the patient claimed to her. Actually, I would disagree with that as well. The latest assessment from the nurse practitioner is found at ER 851, and at that point she says, I've reviewed the MRI from March of 2011, reveals bilateral facet arthrosis, broad-based disc bulge, possibly impinging nerve root. That's the basis for her opinion. Somebody highlighted this with pink or yellow highlighter, and I can't read anything through where they highlighted. You're talking about the highlighting at the top, which gives the date. Forget that. That's just the date. I'm talking about where it says HPI, history of present illness, go down about six or seven lines, and she says patient was last seen 3-21-11, MRI spine from 3-28-11 reveals, and then she goes on. So this is a very important piece of evidence at ER 851. I do say I'm down to three minutes. Let's assume that there was error here by the ALJ with respect to Dr. George. General is the psychologist. What relief are you seeking? I think because the agency's own vocational experts said that those limitations preclude sustained work, and the proper evidence is that it's the agency's own expert witness upon which I rely. That's strong evidence. May I reserve my remainder? Yes. Thank you. Ms. Weiner has claimed she's disabled as a result of seizure disorder. Could you hold on one second? You don't have any opposition to his pending motion, I gather. He says he filed a motion. We do not have opposition. You would agree that it's fine to substitute in the husband as the representative? Yes. And the past benefits award, if any, he's entitled to claim those? As he's been substituted also in the administrative proceeding, that's correct. Okay. Thank you. Ms. Weiner has claimed that she's disabled as a result of a seizure disorder, atrial fibrillation, lower back pain, and depression. The record shows that while these impairments did lead to substantial functional limitations, Ms. Weiner was still able to sustain work. Could you look up when you talk? I missed a word that you just said. Sorry. First, Ms. Weiner's seizure disorder was in control with medication. She admitted to her provider that she would go months without a seizure. And her doctor repeatedly described that condition as well-controlled. She's had two seizures, right? She had – my understanding is she had two grand mal seizures, and then she subsequently was placed on medication. And I assume she takes Dilantin and then controls it. I believe so, yes. And there was one point where she did have some breakthrough seizures. She reported them to her doctor that she was having breakthrough seizures every 4 to 6 months. He increased her dosage of, I believe, Dilantin. And then in subsequent appointments after that, she indicated that she had had no further seizures since that increase in medication. The only thing I could really see – I mean, she has a really bad back, as so many people do. It seems like a design defect. But the only thing I could see in the record that might prevent her from working was either a mental disability or an alcohol problem. Is it the law now that an alcohol problem won't do for Social Security benefits? The law is that a client where drug abuse and alcoholism is a material contributor to their disability cannot receive benefits during the period of that drug abuse and alcoholism. What's the evidence on her mental disability? The evidence on her mental disability was she saw different basically alcohol treatment programs. I understand. What I'm asking you is why wasn't there not substantial evidence on the record taken as a whole for the proposition that a mental disability totally disabled her from working? Well, the record actually shows that while she was having lots of issues with her mental disability concurrent with her alcohol abuse, that once she did gain sobriety, which was some point in 2009, once she did gain sobriety, she improved significantly. She was reporting – at one point she reported she did not have – when she went to seek treatment even for alcohol abuse, she indicated that she did not have other psychological concerns. She was working in a recovery home, indicated that she was able to work in the recovery home. And if we look at the path of that treatment for that mental disability, really once the alcohol abuse subsides, she starts functioning pretty well mentally, certainly well enough to perform unskilled work, which was significantly less taxable. Was she working for remuneration? She was not working for remuneration. So it was considered for purposes of determining her RFC. It wasn't considered at Step 1 for Step 1 purposes to see if she had substantial gainful activity. It's kind of a – I thought living in that home was part of her DUI sort of requirement to participate in one of those recovery programs. It was, but what's interesting about that is it wasn't just that she was living in the home and kind of helping out in the home. The first time that this is mentioned, actually, she indicates she's living in her own apartment and volunteering in the recovery home. So it doesn't seem like that's, you know, just part of a function of her being a resident in the home. That was in March 2010. In June 2010, she's living in the recovery home, but she's saying that she's managing the home. She's not just helping out. She's not in the position of any other resident. She actually is taking a much greater role on a volunteer basis. In July of that year, which is also 2010, she indicates that her company moved her to a home with – so her company moved her, reassigned her, where she was doing a one-on-one monitoring with a seriously mentally ill pregnant woman. Then that August, again, we see her moved again, and she's indicating that she's now the house manager and what she called the boss in the recovery home. And then we go all the way to February 2011, and she indicates that she was somehow demoted at what she called work. And she indicates then that it appeared to be – it was a little bit hard to tell from that record, but it appeared to be that it might have been related to some of the medication that she was taking for her back pain, that there was some fear that she had possibly relapsed based on medication that she was being prescribed. I thought she testified that it was very stressful in her roles that she had at the recovery home. She did indicate that it was very stressful. And I would say that that work is – would certainly be at a higher stress level and at a higher skill level than the unskilled work that the ALJ found that she could perform. So what do we do with, you know, the main argument that Ms. Wiener's counsel makes here is relating to Dr. – what's his name? Dr. General. Yes. Dr. General and Ms. Monchamps. Monchamps. Well, what's interesting about Dr. General's opinion is he looks at Ms. Wiener in July 2009, which is, you know, about a year after the onset date. And what he concludes is she's unlikely to return to work unless she stabilizes her emotional condition. Correct. What the record in this case shows is that she did stabilize her emotional condition. So even if we – But that's not what the ALJ said. And the commissioner concedes that the ALJ did not articulate or properly weigh these opinions. And the commissioner's argument is based on harmless error with respect to these two opinions. But looking at his opinion, you know, even taking it at face value, she did stop drinking at some point in 2009. And, you know, by that December she's reporting complete sobriety for a period of about six months. And after that, she does start doing better. She denies – in March 2010, she denies that she has any psychological concerns. Her therapist indicates in June of 2010 that she's looking stable and happier. And even when she says that she's overwhelmed by the volunteer work she's doing in the recovery home, her provider still says that her mood is perfectly stable. And while she did seem to have an exacerbation based on work stress, the record also shows that that also remedied itself with further treatment with medication and therapy. So, I mean, you make a good argument about how to look at the subsequent evidence and events, but that – again, I have to come back. The ALJ, you know, didn't say that. The ALJ – I think the ALJ, while he doesn't specifically address these opinions, the ALJ does pretty thoroughly discuss the weight of evidence supporting his RFC finding, the weight of the medical evidence generally. And so I think that this Court still can – Do you think that if the ALJ really looked at it, it would say, well, I'm not giving this any – I'm not going to give these opinions any weight because the subsequent evidence outweighs them?  Is that what you think the ALJ – You know, in the case of Dr. General, it's not even the subsequent evidence. It's that there are some real inconsistencies in what Ms. Wiener said to Dr. General during that examination. So she – where she really seemed to be intentionally misstating the extent of her psychological impairments. Can I ask you a slightly different question? But the thing that bothers me about sort of not giving any weight to Dr. General or Longchamps is what was in their report was the subject of the claimant's attorney's hypothetical to the vocational expert. And so when he did a hypothetical to her, to the VEs, that included all of those symptoms, she said there would not be any work that she could sustain. And I guess I find that troubling that when you include all the things that are in the reports that the ALJ didn't consider or give weight to, she said the VE says not only that she could – would be precluded from doing her past work, but that she would be precluded from doing any other work. And it's on page ER-1234. How do you explain that? Well, that would be if these reports were properly credited and if these reports could be properly credited. Well, they could. They could. And if these reports accurately described Ms. Wiener's functioning during the relevant time period. However, our position is that these are limitations that did not belong in the RFC finding, based on the overwhelming weight of evidence in this case. So skipping ahead to the Step 5 questioning of the questioning at Step 5 with the vocational expert, I mean, we don't get to Step 5. You don't get to the Step 5 issue if the restrictions don't belong in the RFC to begin with. And so while, you know, I'll concede that if these were accepted, if these limitations were accepted and, you know, were included in the RFC, that, you know, I'll concede that the vocational expert's testimony is what it was. Yes. You know, and that gets to the creditors' true argument, which I'll get to in a minute. Right. But, you know, I'm not really there yet, but I just think that it's, your argument is harmless air. Yes. And I think that's a tough one here. You know, it is a tough one. Because to some extent we have to kind of say, well, if the IG really had done your thoughtful analysis, this is how he would have resolved this. This is how he would have dealt with their opinions. Yeah. You know, with their statements. He just would have acknowledged them, laid them out, said, well, but I don't give much weight because X, Y, and Z. As you've just explained. Yeah. Well, even Mr. Caldwell mentioned the Court's recent decision in Marsh. Marsh. And one thing that the Court also did in Marsh is the Court was very, very explicitly rejected any idea of a bright-line rule with respect to application of harmless error with respect to, in that case, a treating physician opinion, which we do not have a treating physician opinion here. And that, you know, the analysis really needs to be taken on a case-by-case basis based on the specific facts of the case. But the problem I'm having with this is that since Dr. General was a treating physician, isn't the ALJ? Dr. General actually was not a treating physician. Dr. General was a consulting examiner. So he saw her one time. Psychiatrist. Psychologist. So the agency sent her to for a one-time examination. So he was the agency's. Okay. He was the agency's. He was essentially acted as a medical expert. Was he a physician or a psychologist? I believe he was a psychologist. He was a psychologist. I believe he was a Ph.D. I thought he was a psychologist and not an M.D. Yes. A psychologist is an acceptable medical source. So for purposes of mental impairments. It depends on which ones. For intellectual impairments, yes. Yes. But not for physical impairments. For mental diseases such as bipolar disease, I think no. Isn't that right? You know, I'm actually not. I thought he needed a psychiatrist for bipolar. I believe. I'm not aware of such a distinction. And I believe with respect to psychologists, we regularly see psychologists not just treating for intellectual impairments but also for mental impairments. Oh, really? So I don't. Well, there are different kinds of mental impairments. Yeah. But I don't think that. I've never looked into it. But I don't think that there's an issue with the psychologist. I thought they didn't have prescribing authority for the medicines used for bipolar disease because they didn't have medical license necessary to diagnose it. That I don't know.  Yeah. That I don't know. You don't know? Yeah. Nurse, I wanted to address Nurse Longchamp's opinion for a little bit as well. So Nurse Longchamp opined, and the court looked specifically at that opinion, that Ms. Wiener's pain level would prevent her from maintaining concentration, persistence, and pace. That opinion is really wholly inconsistent with the rest of the record. In treatment records from numerous providers, including from Ms. Longchamp, Ms. Wiener is described as not having problems with memory or difficulty concentrating. And if the court wants to look at ER 859-62, that's where Nurse Longchamp specifically indicates that there aren't memory or concentration problems. The problem here is accentuated by the format of the opinion. It's a check-the-box style form, which isn't in and of itself a problem if there's additional explanation, which there isn't here. But this is an agency form, right? It's not an agency form. Oh, it's not an agency form? No, it's not an agency form. I believe it was probably ‑‑ I don't know, but I believe it was ‑‑ It's a functional capacity RFC questionnaire. Agency forms generally have a number at the bottom. I've seen this form before, but I've seen ‑‑ my understanding is it's a form that's and then provided to the doctors to get the doctors to ‑‑ the doctors with the other providers to get them to provide an opinion. But that's not an agency form. Okay. But the problem really with this form is there's no explanation on the form, and then the actual opinions expressed in it really aren't supported in the record. So I realize I'm almost out of time. You're over your time. Yes. Does anyone have any other questions? No. All right. Thank you. And I believe you were over ‑‑ did Mr. Caldwell have any remaining time, or did he go over? He had three and a half minutes or so. Two and a half minutes. Okay. So, Mr. Caldwell. Well, I'd like to hold it up better. Actually, I just have a few points I want to make. Dr. General said more than there was a poor prognosis. I'm going to read it. Her ability to perform work‑related tasks is limited on the basis of cognitive functions being in the low average range, such as attention span, concentration, short‑term memory, and processing speed. It's more than just an opinion about prognosis. So were there subsequent opinions that tended to negate that? There were opinions in, I think it was the community bridges treatment records that were farther later on that did say she was having improvement. But that doesn't address improvement in a work‑related situation. Those are two separate situations. One thing that really influenced the ALJ is that she had, in fact, been working, albeit in a volunteer capacity. And very limited, and she said she had to have help doing it. It's nowhere near anything that would impact what she was talking about. Why doesn't it impact her ability to work that she was a volunteer and became a boss? Well, I'm not so sure I'm going to agree about being a boss. But the point is, even then, she couldn't sustain those work activities. I think the commissioner's attorney said it. She was demoted. So, you know, the test is whether you can sustain work activities on a regular and continuing basis. And there's just no evidence here that contradicts what Dr. General had to say in that regard. I owe a candor to you, Judge Kleinfeld, so I'm going to tell you that I disagree with you on two things. Kennedy. I disagree with you that a Ph.D. is not an acceptable medical source because they cannot prescribe medications. The factual statement is correct. But the commissioner recognizes Ph.D.s as acceptable medical sources. And so 6.3p. Kennedy. Were things within their expertise. But their expertise includes diagnosis of emotional conditions, not just I.Q. tests. The commissioner recognizes them for diagnosis of conditions such as bipolar disease, her condition. They do. And I'm also going to respectfully disagree just because I need to be honest with you, that her biggest problems were psychological. Certainly that factors into it. But I believe the back pain was very well documented by these previous diagnostic tests. And that's what led to her testimony that I have to lay down for most of the day. I want to finish up with one more thing, if you'll let me. And that's something we haven't talked about at all. The district court took it upon itself when talking about the claimant credibility determination to change the standard from specific, clear, and convincing, which is so well known to the Court I don't need to repeat it, to only specific reasons by relying on an unpublished California district court case. If I didn't appeal that, I wouldn't deserve to be a lawyer. So I think that's an issue that we haven't discussed. But let's just keep in mind that the claimant credibility is a separate issue as well. I'd be happy to answer any other questions. Thank you very much, counsel. Thank you, Your Honor. Weiner v. Colvin is submitted. Previously, we submit Rollins v. Mabus. We also submitted TRP Entertainment v. Cunningham. And we'll take up Cortez v. County of Santa Clara.
judges: Kleinfeld, Wardlaw, Paez